UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 25-mj-03074-JDH

UNITED STATES OF AMERICA

v.

MAXIMO PEPIN

### ORDER ON GOVERNMENT'S MOTION FOR DETENTION

HEDGES, M.J.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 756 (1987). This case is not such an exception. Defendant Maximo Pepin is charged with one count of drug conspiracy in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi). Mr. Pepin came before this Court for an initial appearance on April 17, 2025, at which time the government moved for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(B) and (f)(2)(A). Docket No. 4. Mr. Pepin requested a release hearing and filed an Opposition to the Government's Motion for Detention and Notice of Proposed Release Plan that same day. Docket No. 3. I held a detention hearing on April 18, 2025, during which the parties proceeded by proffer. Docket No. 8. The government argued that no conditions or combination of conditions will reasonably assure Mr. Pepin's appearance as required or the safety of any other person or the community. *See* 18 U.S.C. § 3142(f). Mr. Pepin argued that certain conditions, including the imposition of a curfew with GPS monitoring, would suffice. Following the hearing, I took the matter under advisement.

After careful consideration of the evidence, the parties' arguments at the hearing, and the pretrial services report submitted by the U.S. Office of Probation and Pretrial Services

("Probation Office"), I find that the government has failed to show that no condition or combination of conditions will reasonably assure the appearance of Mr. Pepin as required or the safety of the community. Accordingly, I order that Mr. Pepin be released on conditions, as further set forth below.

## I. LEGAL STANDARD

The Bail Reform Act of 1984 "carefully limits the circumstances under which detention may be sought." *Salerno*, 481 U.S. at 756; *see United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that [the Bail Reform Act] clearly favors nondetention."); *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) ("[I]t is only a 'limited group of offenders' who should be denied bail pending trial." (quotation omitted)). To detain a defendant pending trial, the government must establish (a) by clear and convincing evidence, the defendant is a danger to the community, and no set of conditions can reasonably assure the safety of the community; or (b) by a preponderance of the evidence, the defendant poses a serious risk of flight, and no set of conditions can reasonably assure the defendant's appearance as required. *See* 18 U.S.C. § 3142(e), (f); *United States v. Patriarca*, 948 F.2d 789, 791-93 (1st Cir. 1991).

"Because the law … generally favors bail release, the government carries a dual burden in seeking pre-trial detention." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *see United States v. Cotto*, No. CR 13-30023, 2013 WL 4411264, at *1 (D. Mass. Aug. 14, 2013) (describing two-step process). First, the government may move for detention only "when a defendant has been charged with an offense enumerated in the Act for which Congress has determined that detention is warranted." *Cotto*, 2013 WL 4411264, at *1. The court may not order pretrial detention unless one of the conditions authorizing a detention hearing under 18 U.S.C. § 3142(f) exists. *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988). If none of the

§ 3142(f) conditions apply, the government has not satisfied its burden, and the defendant must be released. *See id.*; *United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003); *Byrd*, 969 F.2d at 109 (holding that § 3142(f) "limit[s] detention to cases that involve one of the six circumstances listed"); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (explaining that detention "is permitted only when the charge is for certain enumerated crimes [under § 3142(f)(1)] … or when there is a serious risk that the defendant will flee, or obstruct or attempt to obstruct justice [under § 3142(f)(2)]"); *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) ("[T]he requisite circumstances [enumerated in § 3142(f)] in effect serve to limit the types of cases in which detention may be ordered prior to trial." (quotation omitted)).

Second, if one or more of the § 3142(f) conditions apply, the government must establish that no set of conditions will reasonably assure the defendant's appearance as required or the safety of any other person or the community. 18 U.S.C. § 3142(c); *Shakur,* 817 F.2d at 195 ("The burden of proof is on the government to prove the absence of such conditions"). The court must impose the least restrictive conditions necessary to provide those reasonable assurances. 18 U.S.C. § 3142(c). When determining if release is appropriate, the court must consider (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence; (iii) the defendant's history and characteristics; and (iv) the nature and seriousness of the danger posed. 18 U.S.C. § 3142(g). "Doubts regarding the propriety of release are to be resolved in favor of defendants." *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990).

Under certain circumstances set forth in 18 U.S.C. § 3142(e), a rebuttable presumption arises that no combination of conditions will reasonably assure the defendant's appearance as required or the safety of any other person or the community. *See* 18 U.S.C. § 3142(e)(2), (3). The defendant may, however, rebut the presumption with "some evidence" demonstrating that he

3

or she does not present a risk of danger or nonappearance. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991). The burden of production to rebut the presumption is "not a heavy one to meet," *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986), and regardless of whether the defendant presents any rebuttal evidence, the presumption is considered together with the factors listed in § 3142(g), *United States v. O'Brien*, 895 F.2d 810, 815 (1st Cir. 1990) (explaining that, when rebutted, the presumption "continues to operate as one factor to be considered by the court in determining whether the defendant must be detained"). The burden of persuasion always rests with the government. *Dillon*, 938 F.2d at 1416.

"Because of the interference of pretrial detention with the important and fundamental right of liberty, despite the presumption of innocence pending trial, this Court will not make … a finding [that detention is warranted] lightly." *United States v. Powell*, 813 F. Supp. 903, 906 (D. Mass. 1992) (cleaned up). Pretrial detention increases the likelihood that the defendant is convicted and sentenced to prison for a longer period of time. *See* Alexander M. Holsinger et al., *Is Pretrial Detention an Effective Deterrent? An Analysis of Failure to Appear and Rearrest Says No*, 87 FED. PROB. J. 3, 6 (2023). It also exposes defendants to countless consequences—including job loss, economic instability, and family strain—before they are even convicted of a crime.[1] *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships."); *Schultz v. Alabama*, 42 F.4th 1298, 1349 (11th Cir. 2022) (Rosenbaum, J., dissenting in part) ("People who are jailed—even for just a day or two—can lose their jobs, homes, and vehicles; and their bonds

---

[1] Congress considered these consequences when it passed the Bail Reform Act of 1966, upon which Bail Reform Act of 1984 expanded. *See* H.R. Rep. No. 1554 (May 18, 1966), at 9 (discussing "adverse effects [of pretrial detention] upon the accused's preparation for trial, retention of employment, relations with his family, his attitude toward social justice, the outcome of the trial, and the severity of the sentence").

4

with family members, who may be relying on them for support or care, can often be deeply affected."). This, in turn, increases the defendant's likelihood of committing another crime in the future—which ultimately increases the risks to others and to the community. *See* Holsinger et al., *supra* at 6 (finding that "incarceration—even if the stint is short—can cut justice-involved people off from prosocial attachments to things like their job and their social relationships, which tends to increase the likelihood of reoffending"). Accordingly, in deciding whether to detain or release Mr. Pepin, I remain mindful of *Salerno*'s mandate that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 756.

## II.     EVIDENCE RELEVANT TO DETENTION[2]

Mr. Pepin is 30 years old and has lived in Massachusetts almost all his life. Mr. Pepin, a naturalized U.S. citizen, was born in the Dominican Republic and moved to the United States when he was four or five years old. Mr. Pepin resides in an apartment in Worcester with his girlfriend—with whom he has been in a relationship since February 2024—and their infant daughter. His girlfriend attended both the initial appearance and the detention hearing. If released, Mr. Pepin proposes that he will reside at his home with his girlfriend and daughter. He has significant family support in Massachusetts. Mr. Pepin has three other children in Massachusetts whom he financially supports and maintains contact with. Mr. Pepin's familial support also includes four siblings in Massachusetts, with whom he has regular contact. Mr. Pepin's father also resides in Massachusetts, though he does not currently have contact with him. Mr. Pepin travels to the Dominican Republic two to three times a year to visit his mother, a daughter from a previous relationship, and his extended family.

---

[2] Much of this personal history is derived from the Pretrial Services Report submitted by the Probation Office, which is not in the public record and is in the custody of the Court. Much of this information was, however, discussed in open court during the detention hearing.

Mr. Pepin has worked at a cleaning company in Worcester for the past few years, alternating between full-time and part-time work. Mr. Pepin believes he can return to his employment with the cleaning company if released. For the past few years, Mr. Pepin has maintained some form of employment, and prior to his current position, he worked at a clothing factory in Canton for a year, a cleaning company in Cambridge for over a year, and at his father's corner store in Dorchester for three years. He attended English High School in Boston, but he left school prior to obtaining his diploma. Mr. Pepin reports no medical problems and no history of mental health concerns. He uses marijuana weekly and reports rare alcohol use.

Over eleven years ago, in November 2013, Mr. Pepin pled guilty in Suffolk Superior Court to one count of home invasion, two counts of armed robbery, three counts of firearms charges, two counts of kidnapping, and two counts of assault and battery with a dangerous weapon, for an offense he committed in January 2013 when he was seventeen years old.[3] Docket No. 10-1, Exhibit A at 6. In November 2013, Mr. Pepin was sentenced to a maximum of five years and a minimum of four years incarceration and three years of probation. *Id.* After his release, while on supervision in October 2018, Mr. Pepin was charged with a violation of probation and voluntarily appeared for a court hearing. *Id.* at 7. Mr. Pepin was found to be in violation of his conditions of release and his probation was extended to February 2021 on the same conditions of release. *Id.* at 8.

In August 2019, Mr. Pepin pled guilty in Lawrence District Court to one count of possession with intent to distribute fentanyl and was sentenced to two years incarceration.

---

[3] In September 2013, Massachusetts raised the upper limit of juvenile jurisdiction from seventeen to eighteen years old for all crimes except first- and second-degree murder. *See* 2013 Mass. Acts ch. 84 (titled "An Act Expanding Juvenile Jurisdiction"). Thus, if Mr. Pepin had engaged in the same conduct eight months later, he would have likely been tried as a juvenile. *See id.*

6

Docket No. 10-4, Exhibit D at 2. Based on this new charge, his probation for the 2013 case was revoked, and he was sentenced to three years and one day which was served concurrent with his sentence on the 2019 conviction. Docket No. 10-1, Exhibit A at 10. Upon his release, Mr. Pepin successfully completed his probation with no further incidents until its termination in March 2022. Docket No. 10-2, Exhibit B at 1. Prior to that, while still on supervision in November 2021, Mr. Pepin requested permission to travel to the Dominican Republic to visit his mother, which the court allowed. Docket No. 10-3, Exhibit C.

At the detention hearing, the government asserted that, during the execution of a search warrant at Mr. Pepin's home on April 17, 2025, officers recovered an unloaded gun on the bedside table (though no ammunition was recovered), as well as approximately $10,000 in cash, and a cell phone with a phone number that was identified during the government's investigation as associated with multiple controlled fentanyl purchases.

Counsel for the government also presented information from the Assistant United States Attorney in the District of Maine about interviews with unnamed individuals in connection with its investigation. The government proffered that Mr. Pepin's criminal conduct relevant to the instant offense traces back to an investigation of a May 2024 shooting in Maine during a fentanyl transaction. The government asserted that, although Mr. Pepin was not present during this drug sale, the shooter later indicated during a police interview that Mr. Pepin supplied both the fentanyl and the gun involved in the incident. The government also proffered that, during two interviews that took place following the execution of a search warrant on April 17, 2025 at a residence in Maine where officers recovered one pound of fentanyl, one unidentified interviewee asserted that they had obtained fentanyl from Mr. Pepin in the past, but that their relationship broke down after Mr. Pepin threatened to harm the interviewee's girlfriend. The government

7

further proffered that the other unidentified interviewee asserted that they had obtained between two and three kilograms of fentanyl per week from Mr. Pepin for the last month. The government did not present any additional facts or evidence supporting the interviewees' assertions other than the oral proffer of the Assistant United States Attorney, who summarized the assertions of the Assistant United States Attorney from Maine.

### III. ANALYSIS

#### A. Applicability of 18 U.S.C. § 3142(f) Conditions

The government moved for a detention hearing under 18 U.S.C. § 3142(f)(1)(B), asserting that Mr. Pepin is charged with an offense for which the maximum sentence is life imprisonment, and 18 U.S.C. § 3142(f)(2)(A), asserting that there is a serious risk that Mr. Pepin will flee because of his ties to the Dominican Republic and the fact that Mr. Pepin is facing a minimum sentence of 10 years. I find that a detention hearing was warranted based upon either of the government's asserted grounds.[4] Because there are grounds for conducting a hearing under 18 U.S.C. § 3142(f), I must consider factors under 18 U.S.C. § 3142(g) to determine whether there are any conditions of release that will reasonably assure Mr. Pepin's appearance as required and the safety of any other person and the community.

#### B. Rebuttable Presumption

The government asserts that Mr. Pepin is subject to the rebuttable presumption under 18 U.S.C. § 3142(e)(3)(A) because there is probable cause to believe he committed an offense under the Controlled Substances Act for which a maximum term of imprisonment of 10 years or more is prescribed. In his opposition to the government's motion for detention, Mr. Pepin concedes

---

[4] At the detention hearing, the government asserted that although it did not move on this ground, it would also be appropriate for the Court to find that a detention hearing is warranted pursuant to 18 U.S.C. § 3142(f)(1)(C). Because I find that a detention hearing was warranted and that the standard is the same under either ground, I need not consider this alternative basis.

that he is subject to a rebuttable presumption. Docket No. 3 at 2. Accordingly, I begin from the presumption that no condition or combination of conditions can reasonably assure Mr. Pepin's appearance and the safety of any other person and the community. *See* 18 U.S.C. § 3142(e). Mr. Pepin, however, may rebut this presumption with "some evidence" to the contrary. *See Dillon*, 938 F.2d at 1416.

I find that Mr. Pepin has sufficiently rebutted the presumption under 18 U.S.C. § 3142(e)(3)(A). Mr. Pepin has proposed a plan for release that includes a curfew, location monitoring, and travel restrictions. Mr. Pepin has also presented evidence of his strong ties to his family and the community. Mr. Pepin represents that, if he is released, he will continue to work at the cleaning company where he has been employed for the last few years. The burden of production to rebut the presumption is "not a heavy one to meet," *Dominguez*, 783 F.2d at 707, and Mr. Pepin has met this burden.

### C. Analysis of Factors Under 18 U.S.C. § 3142(g)

#### i. Nature of the Offense

Mr. Pepin is charged by indictment with conspiracy to distribute and possess with intent to distribute 400 grams or more of a mixture of substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi). This is a serious charge that weighs against releasing him. While he has not been charged with being a felon in possession of a firearm, the fact that the government proffered that an unloaded firearm (but no ammunition) was found in his home during the execution of the search warrant also weighs against release.

### *ii. Weight of the Evidence*

At the detention hearing, the government presented little evidence demonstrating Mr. Pepin's involvement in a drug conspiracy. Other than a cell phone the government asserts is associated with multiple controlled fentanyl purchases and approximately $10,000 in cash recovered from Mr. Pepin's home, the government mostly relied on summaries of uncorroborated statements from unidentified witnesses made to unidentified individuals. While the government also presented evidence that officers recovered one pound of fentanyl during the execution of a search warrant the previous day at a residence in Maine, it did not explain how those drugs related to the charged offense beyond stating that two unidentified witnesses claimed in police interviews that they had consistently received large amounts of fentanyl from Mr. Pepin in the past. While I weigh this evidence, I do not weigh it heavily, given that it was based on several layers of hearsay and unsupported by any documentation. *Cf. United States v. Acevedo-Ramos*, 755 F.2d 203, 208 (1st Cir. 1985) (finding agent's testimony at detention hearing containing hearsay evidence to be sufficiently reliable when testimony was detailed, consistent, and given under oath, and most of the evidence offered in support of the risk of obstruction of justice was publicly available, among other things).

Moreover, I emphasize that although the Bail Reform Act "permits the court to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (citing *United States v. Edson,* 487 F.2d 370, 372 (1st Cir.1973)). "These factors may be considered *only* in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community … [o]therwise, if the court impermissibly makes a

preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment." *Id.* (citations omitted).

### iii. History and Characteristics

In assessing this factor, I must consider Mr. Pepin's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Mr. Pepin has lived in Massachusetts nearly all his life and has strong ties to the community, including his girlfriend and infant daughter with whom he lives, four siblings, and three other children. Mr. Pepin financially supports and maintains regular contact with all his children. Mr. Pepin's support from his girlfriend is exemplified by her presence at both the initial appearance and the detention hearings and his proposed plan to continue to reside with his girlfriend and daughter upon his release.

Mr. Pepin reports regular employment for the last few years, including most recently at a cleaning company for two years where he believes he can return to work if released. Although Mr. Pepin reports weekly cannabis use, if released, he agrees to refrain from use or possession of marijuana, regardless of any state law or prescription, and any narcotic or controlled substance without a valid prescription.

Mr. Pepin's criminal history includes robbery and firearms-related convictions from 2013, a state drug distribution conviction from 2019, and a drug possession conviction from 2012, when he was a juvenile. Although Mr. Pepin incurred the 2019 drug charge while on probation for his armed robbery conviction, he served an additional three-year sentence and, upon his release, completed his supervision without incident until its termination in 2022. Mr.

11

Pepin presented evidence of a history of appearance at court proceedings, including a voluntary appearance while on supervision in October 2018 for a violation of probation. Mr. Pepin's ability to comply with the conditions of his release is also demonstrated by his November 2021 motion requesting permission to travel to the Dominican Republic to visit his mother, which the court allowed, and which appears to have occurred without incident.

In light of Mr. Pepin's strong ties to the community and familial support, his employment history and ability to return to his job if released, the considerable time that has passed since his most serious conviction, and his history of appearing at court proceedings, I find that this factor weighs in favor of release.

### iv. *Dangerousness*

At the hearing, the government argued that Mr. Pepin's charged offense is "bookended" by acts of violence. The government first pointed to a May 2024 shooting during a fentanyl transaction in Maine, where the shooter allegedly claimed in an interview that both the fentanyl and the gun involved in the incident were supplied by Mr. Pepin. However, the government conceded that Mr. Pepin was not present at this drug sale. Further, the government proffered no additional facts to support this allegation beyond the uncorroborated statements of an unidentified witness to an unidentified person. The government next pointed to a claim made by one of the unidentified interviewees in Maine that Mr. Pepin threatened to harm his girlfriend. The government offered no details about when or how such threats were allegedly made, and again, offered no additional facts to support this allegation beyond the uncorroborated statement of an unidentified witness. The government asserted that Mr. Pepin's risk of violence is further demonstrated by the presence of a gun in his home, where he plans to reside if released. This

final fact is more concerning. However, I note that the gun was not loaded, and the government did not recover ammunition during the search.

The government also pointed to Mr. Pepin's criminal conviction in 2013. I do not take lightly these past criminal offenses. However, Mr. Pepin committed these offenses more than a decade ago when he was only seventeen years old. Courts have long recognized that youth bears on an individual's blameworthiness and culpability in committing a criminal offense. *See Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (explaining that "[i]nexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult"); *see generally* MASS. GEN. HOSP., CTR. FOR LAW, BRAIN & BEHAVIOR, WHITE PAPER ON THE SCIENCE OF LATE ADOLESCENCE: A GUIDE FOR JUDGES, ATTORNEYS, AND POLICY MAKERS (2022), https://clbb.mgh.harvard.edu/wp-content/uploads/CLBB-White-Paper-on-the-Science-of-Late-Adolescence-3.pdf.

Thus, I find that the most persuasive and reliable evidence presented as to Mr. Pepin's risk of danger if released is a conviction from more than 10 years ago, for which Mr. Pepin has already served a considerable sentence. This past conviction, for a crime committed when Mr. Pepin was only seventeen years old, does not weigh strongly in favor of detention.

### D. Assessment of All Factors

After carefully evaluating the evidence in light of the criteria set forth in 18 U.S.C. § 3142, and in consideration of the intent of the Bail Reform Act that "detention prior to trial or without trial is the carefully limited exception," *Salerno*, 481 U.S. at 756, I find that the government has not established that no conditions of release will reasonably assure the appearance of Mr. Pepin as required or the safety of any other person or the community.

13

### *i. Risk of Nonappearance*

For detention based upon a serious risk of nonappearance under 18 U.S.C. § 3142(f)(2), the government must show by a preponderance of the evidence that conditions of release cannot reasonably assure Mr. Pepin's appearance as required. *See Patriarca*, 948 F.2d at 791-93. Having considered the factors set forth in 18 U.S.C. § 3142(g), I find that the government has not shown by a preponderance of the evidence that the risk of flight is so great that no conditions could reasonably assure Mr. Pepin's appearance as required.

Mr. Pepin's ties to Massachusetts are strong. Not only does most of his family reside here, but he also has four children here, for whom he is financially responsible. These important relationships, coupled with Mr. Pepin's history of appearing in court as required and substantial compliance with the terms of his past probation, weigh against the risk that Mr. Pepin will not appear as required in the future. Though the government points to Mr. Pepin's ties to the Dominican Republic and the substantial cash that was recovered from his home as indicative of incentive and means to flee, I am not persuaded by these arguments. Although Mr. Pepin does now face the possibility of a life-long sentence if convicted, Mr. Pepin has demonstrated his willingness to appear in the past, and in 2021, after receiving court permission to travel to the Dominican Republic to visit his mother, Mr. Pepin returned to the United States and continued his probation. Thus, I find that the conditions of GPS monitoring, travel restricted to the District of Massachusetts (except for travel to Maine as necessary for court appearances), the surrender of Mr. Pepin's passport, and home detention (except for certain limited activities approved by probation), would sufficiently mitigate any risk of flight.

### ii. *Risk of Danger*

Based upon the factors set forth in 18 U.S.C. § 3142(g), I find that the government has not shown by clear and convincing evidence that no conditions of release can reasonably assure the safety of any other person or the community. *See* 18 U.S.C. § 3142(f)(1), *Ploof*, 851 F.2d at 11-12.

At the detention hearing, the government mostly relied on uncorroborated summarized statements of unidentified witnesses to unidentified individuals in support of its assertions that Mr. Pepin poses a serious risk of danger to the community. As previously indicated, such evidence does not sufficiently satisfy the government's burden to make this showing by clear and convincing evidence. While Mr. Pepin's 2013 criminal convictions are serious offenses which I do not take lightly, Mr. Pepin committed these crimes more than a decade ago when he was only seventeen years old, and he accepted responsibility for his actions, pled guilty, and served a substantial sentence at a young age.

Finally, the community safety concerns triggered by the nature of the offense charged in the indictment can be reasonably mitigated by strict conditions that ensure Mr. Pepin's whereabouts are accounted for, his travel and activity outside of the home is limited, and his employment and housing remain stable. The evidence of Mr. Pepin's strong ties to Massachusetts, his family and community ties, and the evidence of his economic stability through regular employment for the last few years, all suggest that Mr. Pepin has the resources and support he needs to be successful while on pretrial release.

### iii. *Adequacy of Proposed Conditions*

No conditions of release can guarantee a defendant's appearance or the safety of any other person or the community. To the contrary, the Bail Reform Act requires courts to

determine whether any condition or combinations of conditions will "reasonably assure" the defendant's appearance and the safety of any other person or the community. *See United States v. Hir*, 517 F.3d 1081, 1092 n.9 (9th Cir. 2008) ("[T]he Bail Reform Act contemplates only that a court be able to 'reasonably assure,' rather than guarantee, the safety of the community."); *United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996) (per curiam) ("Section 3142 speaks of conditions that will 'reasonably' assure appearance, not guarantee it.").

For the reasons stated herein, I find that the imposed conditions will reasonably assure Mr. Pepin's appearance and the safety of any other person or the community.

### IV. CONCLUSION

It is hereby ORDERED that Mr. Pepin be RELEASED pending trial, subject to the following conditions:

1. Report to U.S. Probation and Pretrial Services as directed.

2. Maintain residence and notify U.S. Probation and Pretrial Services of any intended change of residence so that a home visit can be completed.

3. Surrender any passport to U.S. Probation and Pretrial Services and do not obtain any passport or other international travel documents during the pendency of this case.

4. Mr. Pepin shall be subject to home detention via location monitoring and is restricted to his residence at all times except as pre-approved by the Probation Office for court purposes, meetings with counsel, medical and/or mental health treatment, religious services, employment, childcare-related duties, or other pre-approved activities. Mr. Pepin shall refrain from obstructing or attempting to obstruct or tamper in any fashion with the efficiency and accuracy of any location monitoring equipment.

5. Travel restricted to the District of Massachusetts and, as necessary, to the District of Maine directly to and from required Court appearances or consultations with his attorney.

6. Maintain or seek employment and do not change employment without notifying U.S. Probation and Pretrial Services in advance.

7. Refrain from possessing any firearm, destructive device, or other dangerous weapon.

8. Refrain from use or possession of marijuana, regardless of any state law or prescription approving of its use, and any other narcotic drug or other controlled substances defined in 21 U.S.C. 802, unless prescribed by a licensed medical practitioner.

9. Submit to any testing required by the pretrial services office or the supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of a prohibited substance screening or testing.

10. Refrain from contact, direct or indirect, with any co-defendant or alleged co-conspirator.

11. Report any contact with law enforcement within 24 hours.

Date: April 22, 2025

/s/ Jessica D. Hedges
United States Magistrate Judge